[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 09-11984

————————————————

D. C. Docket No. 07-00002-CR-004-CAR-5

FILED
US COURT OF APPEALS
ELEVENTH CIRCUIT

FEBRUARY 21, 2013

JOHN LEY
CLERK

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JACK KELLY JOSEPH,
DOROTHY MACK,
SPURGEON GREEN, JR.,

Defendants-Appellants.

————————————————

Appeals from the United States District Court
for the Middle District of Georgia

————————————————

(February 21, 2013)

Before MARCUS and PRYOR, Circuit Judges, and FRIEDMAN,* District Judge.

PRYOR, Circuit Judge:

_____

* Honorable Paul L. Friedman, United States District Judge for the District of Columbia, sitting
by designation.

The main issue presented in this appeal involves a jury instruction about proving a violation of the Controlled Substances Act, 21 U.S.C. § 801 et seq., by medical professionals. A physician, his assistant, and a pharmacist convicted of violating the Act in connection with the operation of a "pill mill" argue that a jury instruction at their trial ran afoul of the decision in <u>Gonzales v. Oregon</u>, 546 U.S. 243, 126 S. Ct. 904 (2006), by evaluating their conduct against a national standard of professional practice. The indictment charged Spurgeon Green Jr., a physician, and Dorothy Mack, a physician's assistant at Green's clinic, with dispensing or distributing controlled substances to drug abusers and drug pushers without a legitimate medical purpose and outside the usual course of professional conduct, 21 U.S.C. § 841(a). The indictment also charged Jack Kelly Joseph, a pharmacist, with unlawfully filling many of the prescriptions for the drugs, <u>id.</u> And the indictment charged Green, Mack, and Joseph with conspiring to violate the Act, <u>id.</u> § 846. The defendants' argument, raised for the first time on appeal, that the jury instruction ran afoul of <u>Gonzales</u> fails because it is based on a misreading of that instruction, which instead required the prosecution to prove that the defendants' conduct failed to comply with any accepted standard of practice. The defendants' remaining arguments about the jury instructions, the sufficiency of the evidence,

2

the admission of testimony by a police investigator, a search warrant of Green's home, and the reasonableness of Green's sentence fail too. We affirm their convictions and Green's sentence.

## I.  BACKGROUND

From 1992 to 2003, Green operated a medical clinic in Perry, Georgia. Houston County police became suspicious that Green's medical clinic was not an ordinary doctor's office after they received complaints about long lines of people waiting outside the clinic.  Police conducted surveillance of the clinic and observed that the parking lot outside the clinic was often full of patients waiting to see Green.  Green's patients frequently arrived in groups of three or four people and in cars with license plates that suggested they had traveled from other counties in Georgia or from other states.  Police also conducted sixty-four "trash pulls" from the dumpster outside the clinic, and they conducted traffic stops of vehicles departing the clinic to identify the occupants of those vehicles.  Police learned that many of Green's patients had their prescriptions filled at a pharmacy that was owned and operated by Joseph.

Police executed warrants to search Green's medical clinic, his home, and a storage unit that he maintained.  The search warrants were supported by affidavits that attested that Green had unlawfully dispensed or distributed controlled

3

substances and that evidence of Green's crimes would be found at his home. During the search, police retrieved, among other evidence, medical records from Green's clinic, about $800,000 from his home, and receipt books from his storage unit. Green filed a motion to suppress the fruits of the search of his home on the ground that the affidavit failed to provide probable cause that evidence of Green's crimes would be found there, but the district court denied the motion.

A federal grand jury returned an 89–count second superseding indictment charging Green, Joseph, and Mack with violations of the Controlled Substances Act. The indictment charged that Green, with the assistance of Mack, prescribed controlled substances outside the usual course of professional practice to patients who had no legitimate medical need for those substances, and that Joseph filled those prescriptions even though he knew that Green and Mack issued the prescriptions without any legitimate medical need and outside the usual course of professional practice. The indictment charged that these actions violated section 841(a)(1) of the Act, which provides that, "[e]xcept as authorized by this subchapter, it shall be unlawful for any person knowingly or intelligently . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." Id. § 841(a)(1). Practitioners may issue prescriptions for controlled substances so long as the prescriptions are issued

4

"for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice," 21 C.F.R. § 1306.04(a), and the indictment charged that all three defendants acted without a legitimate medical purpose and outside the usual course of professional practice. Count 1 of the indictment charged Green, Mack, and Joseph with conspiring to dispense and distribute Schedule II, III, and IV controlled substances without a legitimate medical purpose and outside the usual course of professional practice, 21 U.S.C. § 846. Counts 2 through 86 charged some or all of the defendants with substantive violations of the Act, id. § 841(a)(1). Counts 87 and 88 charged Green and Joseph respectively with maintaining a place of business for the purpose of unlawfully distributing a controlled substance, id. § 856(a)(1). And count 89 provided the defendants notice of criminal forfeiture, id. § 853. All three defendants proceeded to a jury trial.

The prosecution presented evidence at trial that Green's medical practice and his clinic were unusual in many respects. Green saw as many as 100 patients each day. He required that his patients pay in cash or by credit card before they met with him, and he did not accept private insurance. Inside the clinic, patients were sometimes rude and hysterical. Some patients could be heard retching in the bathroom, while other patients offered the receptionists bribes to see the doctor as

5

soon as possible. Outside the clinic, patients sometimes camped overnight, sleeping in cars and urinating in public.

Many of Green's former patients were addicted to prescription drugs or sold their prescription drugs to addicts. These patients went to Green's clinic because they knew he would give them the prescription drugs they wanted. One former patient testified that it was "common knowledge . . . that you could go to [Green] and basically write a grocery list [of] what you needed, and, you know, he would fill it." Another former patient addicted to prescription drugs testified that her "honest opinion was it was a dope house," and she testified that "people were getting sick in the bathroom, you know. There was drug deals going on in the parking lot."

Green and Dorothy Mack, who worked as a physician's assistant at Green's clinic from 2000 to 2003, knew that many of their patients were drug abusers. Some patients had on their arms "track marks," which evidence drug abuse and make it difficult for nurses to find a vein to draw blood. Green and Mack often assisted the nurses at the clinic to draw blood from patients with track marks. Friends and family of Green's patients sometimes called Green's clinic to report that Green's patients were misusing their drugs and these complaints were communicated to Green and sometimes to Mack.

6

Sergeant Manny Quinones, a police officer who investigated Green's clinic, testified that police determined, during the course of their investigation, that Green's patients included about 300 individuals who had violated drug laws in the past. Quinones testified that officers identified these drug offenders based on months of visual surveillance of the clinic, investigation of the license plate numbers of Green's patients, traffic stops of vehicles leaving the clinic, and sixty-four trash pulls conducted at the clinic. Green objected to this testimony on the grounds that it was unduly prejudicial and that the government did not lay an adequate foundation for the testimony, but the district court overruled the objection and admitted the testimony.

The prosecution also presented expert testimony that Green, Mack, and Joseph dispensed or distributed the prescription drugs without a legitimate medical purpose and outside the usual course of professional practice. Dr. Barry Straus, an expert in pain management and the prescription of controlled substances who was a practicing physician in Georgia, testified, based on his review of the medical records maintained by Green and Mack, that their medical treatment was "below minimum standards on recordkeeping, on treatment, on diagnosis." Dr. Straus testified that there was no legitimate medical reason to prescribe many of the combinations of drugs that Green and Mack prescribed for their patients. Dr.

7

Straus also testified that, based on his review of the medical records, Green and Mack did not conduct a thorough medical examination of their patients. Dr. Straus testified that, if Green had conducted a thorough evaluation of each new patient, he would not have been able to treat the large number of patients he treated each day. Dr. Straus also testified that Green's computer medical records suggested that records detailing physical exams of patients were fabricated. Dr. Straus stated that, after reviewing the medical records, one has to "really bend[] over backwards and just mak[e] stuff up to justify [the medical practices of Green and Mack]."

The prosecution presented expert testimony that certain warning signs should alert doctors and pharmacists that their patients may be abusing prescription drugs, and the prosecution presented evidence that many of Green's patients and Joseph's customers exhibited these warning signs. Dr. Straus testified about the warning signs that should alert a physician that his patients are either abusing their drugs or selling their drugs to drug abusers. Dr. Straus testified that among these warning signs are patients who lose their medication or run out of their medication early, patients who travel long distances to see a particular physician, and phone calls from family and friends stating that a patient is abusing his or her prescription drugs. Dr. John Holbrook, an expert in pharmacology and the prescription of controlled substances, testified about the warning signs that should alert a

8

pharmacist that a patient is abusing or selling his drugs or that a patient's prescription was not written for a legitimate medical purpose. Dr. Holbrook testified that among these red flags are patients who are unduly anxious to have their prescriptions filled, have their prescriptions filled at pharmacies located far from their homes, and wear long-sleeved clothing during warm weather seasons to conceal "track marks" on their arms. Dr. Holbrook also testified that a pharmacist has ethical, moral, and legal responsibilities to ensure that he does not fill for a single patient several prescriptions that, if taken together, pose a danger to the health of the patient.

Green and Mack also dispensed or distributed controlled substances during the week of September 23, 2002, when Green was out of town and Mack saw 88 of Green's patients on his behalf. Before he left town, Green pre-signed dozens of prescriptions for his patients, and he instructed Mack to deliver the prescriptions to his patients if she thought it appropriate to do so. All of the 88 patients that Mack examined during the week of September 23, 2002, were existing patients of Green, and Mack did not examine any new patients that week. Mack delivered to 32 of those 88 patients prescriptions for controlled substances that the Drug Enforcement Agency classified as "Schedule II" controlled substances. Schedule II controlled substances have "a high potential for abuse," and "[a]buse of the drug or other

9

substances may lead to severe psychological or physical dependence." Id. § 812(b)(2). Mack lacked authority under Georgia law to write prescriptions for Schedule II drugs, but she had authority to write prescriptions for Schedule III, Schedule IV, and Schedule V drugs, which have a lower potential for abuse than Schedule II drugs.

Experts for both the prosecution and defense stated that doctors are not permitted to pre-sign prescriptions. Dr. Straus testified that both state and federal regulations prohibit doctors from signing prescriptions on a date other than the date on which they deliver the prescriptions to patients. The relevant federal regulation provides that "[a]ll prescriptions for controlled substances shall be dated as of, and signed on, the day when issued." 21 C.F.R. § 1306.05. Dr. Straus testified that these regulations are designed to ensure that the doctor examines the patient before delivering the prescription and to ensure that there is a legitimate medical reason for delivering the prescription. Dr. Straus stated that every "legitimate doctor" and "legitimate physician's assistant" knows that he may not pre-sign prescriptions. Dr. Straus did not review any of the patient charts of the 32 patients who received pre-signed prescriptions during the week of September 23, 2002. Dr. Frank Adams, an expert in pain management and internal medicine who testified on behalf of the defendants, testified that there are "[n]o exceptions" to the rule that

10

doctors "cannot pre-sign Schedule II prescriptions." But Dr. Adams testified that, in some circumstances, it might be acceptable "from a clinical point of view" for a physician's assistant to give a patient a new prescription for a drug that a medical doctor has already prescribed for that patient in the past.

Mack testified at trial and conceded that she had violated the regulation that prohibits physicians from pre-signing prescriptions. Mack knew that she was not allowed to write prescriptions for Schedule II controlled substances, but she nonetheless gave some patients pre-signed prescriptions for Schedule II drugs during the week of September 23, 2002. Mack testified that she did not know then that prescriptions may not be pre-dated or pre-signed, although she conceded that she should have known about that prohibition. Mack testified that she examined all 88 of the patients she saw that week and that she tried to determine "in [her] best judgment, whether or not [the patients] needed the medications that Dr. Green had them on." Mack testified that she did not become suspicious that any of those 88 patients were abusing or diverting their prescription medications until she heard testimony to that effect at trial. Mack also testified that she often refused to fill prescriptions for patients who showed signs of drug abuse and that, during the week of September 23, 2002, she dismissed some patients from the clinic because they showed signs of abusing prescription drugs.

11

The prosecution presented evidence contradicting Mack's testimony that she had scrupulously considered whether her patients had a legitimate medical need for their prescriptions. Tonya Tyson, an investigator with the Drug Enforcement Agency, testified that the medical records from the week of September 23, 2002, suggested that Mack had performed either no physical exam or only a cursory exam before she prescribed patients Schedule II drugs. And Dr. Straus testified that, if Mack sometimes refused to treat patients who appeared to have abused their drugs, Mack would have been even more culpable if she had prescribed controlled substances for other patients who showed evidence of drug abuse.

Green testified at trial and admitted that he had pre-signed the 32 prescriptions. Green testified that he contacted the Drug Enforcement Agency by telephone to inquire whether he could pre-sign prescriptions and that an Agency official told him that he could pre-sign the prescriptions. Green could not recall the name of the agent who approved the pre-signed prescriptions. Green stated that pre-signing a prescription is akin to writing a prescription with a "Do Not Fill Until" date, and Green testified that he directed Mack to deliver the prescriptions to his patients only if she determined that there were no signs that the patients were abusing the medication.

12

The prosecution produced testimony that contradicted Green's statement that a pre-signed prescription is akin to a "Do Not Fill Until" prescription. Dr. Straus said that there is a significant difference between pre-signing prescriptions and dispensing to a patient a "Do Not Fill Until" prescription. Dr. Straus testified that, in 2002, it was uncertain whether it was legal for a physician to consult with a patient and give them a "Do Not Fill Until" prescription for a Schedule II substance, but that "no one ever thought pre-signing and pre-dating prescriptions was legal." Mark Caverly, the chief of the Office of Diversion Control in the Drug Enforcement Agency, testified that pre-signed prescriptions and "Do Not Fill Until" prescriptions are "completely separate issue[s]," and he testified that the Agency has never permitted doctors to pre-sign and pre-date prescriptions.

Near the end of the trial, the district court instructed the jury that the prosecution had to prove beyond a reasonable doubt that the practitioners delivered the prescriptions without a legitimate medical purpose or outside the usual course of professional practice. And the district court instructed the jury as follows about a "good faith" defense under the Act:

> [A] pharmacist who in good faith dispenses a controlled substance pursuant to a proper prescription from a licensed physician for a legitimate medical purpose in the usual course of his professional practice does not violate the statute.

13

[…]

> A controlled substance is prescribed by a physician in the usual course of professional practice and, therefore, lawfully, if the substance is prescribed by him in good faith as a part of his medical treatment for the patient in accordance with a standard of medical practice generally recognized and accepted in the United States.

The district court also instructed the jury that "[a] pharmacist who is registered under the Controlled Substances Act is authorized to dispense or distribute controlled substances pursuant to the legitimate prescription of a registered physician."  Green objected that the district court should have adopted his proposed instruction that, "[i]f a doctor dispenses drugs based on a good faith belief he is medically treating a patient, then the doctor has dispensed the drug for a legitimate medical purpose in the usual course of medical practice; that is, he has dispensed the drug lawfully," but the district court overruled this objection.

The Act provides for an enhanced prison sentence of 20 years of imprisonment to life imprisonment if "death or serious bodily injury results from the use of" an unlawfully dispensed or distributed Schedule II controlled substance, 21 U.S.C. § 841(b)(1)(C), and the indictment charged some or all of the defendants with 13 counts of causing death or serious bodily injury.  The district court instructed the jury that the delivery of the controlled substance must be a "but for" cause of the victim's death or serious bodily injury.  The district court did not

14

instruct the jury that the Act requires that the prosecution prove that the delivery of the controlled substance was also a proximate cause of the victim's death or serious bodily injury.

The jury found Green guilty as to the conspiracy count and 45 substantive counts of violating section 841(a)(1).  Among these substantive counts, the jury convicted Green of count 12, which charged that Green unlawfully dispensed or distributed a Schedule II controlled substance, causing death or serious bodily injury to the patient, and of counts 52 through 83, which charged that Green unlawfully dispensed or distributed Schedule II controlled substances, without a legitimate medical purpose and outside the usual course of professional practice, by pre-signing prescriptions that were delivered to patients during the week of September 23, 2002.  The jury convicted Mack of counts 52 through 83, which charged that Mack unlawfully dispensed or distributed Schedule II controlled substances, without a legitimate medical purpose and outside the usual course of professional practice, by issuing pre-signed prescriptions to patients during the week of September 23, 2002.  The jury convicted Joseph only of the conspiracy count.

The district court sentenced Green to 30 years in prison, Mack to 41 months in prison, and Joseph to 84 months in prison.  Green's presentence investigation

report calculated his guideline range as 30 years of imprisonment to life imprisonment, and at Green's sentencing hearing, the district court adopted that guideline range. Green requested a downward variance to the mandatory minimum sentence of 20 years of imprisonment. The district court rejected Green's request and imposed a prison sentence of 30 years of imprisonment.

## II.    STANDARDS OF REVIEW

Several standards of review govern this appeal. We review de novo whether the district court misstated the law in its jury instruction, United States v. Campa, 529 F.3d 980, 992 (11th Cir. 2008), and whether the evidence is sufficient to support a conviction, United States v. Baker, 432 F.3d 1189, 1231 (11th Cir. 2005). When we review whether the evidence is sufficient to support a conviction, we view the evidence in the light most favorable to the prosecution and draw all reasonable inferences and credibility choices in favor of the jury verdict, United States v. Tampas, 493 F.3d 1291, 1297–98 (11th Cir. 2007), and we must affirm a conviction unless there is no reasonable construction of the evidence from which the jury could have found the defendants guilty beyond a reasonable doubt, United States v. Ignasiak, 667 F.3d 1217, 1227 (11th Cir. 2012). We review for an abuse of discretion evidentiary rulings of the district court to which a timely objection is made, United States v. Tinoco, 304 F.3d 1088, 1119 (11th Cir. 2002), a refusal of

16

the district court to give a requested jury instruction, United States v. Tokars, 95 F.3d 1520, 1531 (11th Cir. 1996), and the substantive reasonableness of a prison sentence, United States v. Gonzalez, 550 F.3d 1319, 1323–24 (11th Cir. 2008). We afford "great deference" to the determination of a magistrate judge that a search warrant affidavit is supported by probable cause, and we uphold the determination of the magistrate judge so long as he "had a substantial basis for concluding that a search would uncover evidence of wrongdoing." Illinois v. Gates, 462 U.S. 213, 236, 103 S. Ct. 2317, 2331 (1983) (internal quotation marks and alterations omitted). We review unpreserved objections for plain error, including unpreserved objections to the jury instructions, Wilbur v. Corr. Servs. Corp., 393 F.3d 1192, 1204 n.6 (11th Cir. 2004), and to the sufficiency of the evidence, United States v. Dunlap, 279 F.3d 965, 966–67 (11th Cir. 2002).

## III.  DISCUSSION

We divide our discussion in five parts.  First, we discuss why the defendants' five objections to the jury instructions all fail.  Second, we discuss why the district court did not abuse its discretion when it admitted the testimony of a police investigator that Green's patients included 300 known drug dealers.  Third, we discuss why the warrant to search Green's home was supported by probable cause.  Fourth, we discuss why there was sufficient evidence to support the

17

convictions of Green and Mack.  Fifth, we discuss why Green's sentence is reasonable.

A. *The District Court Committed No Reversible Error in Its Jury Instructions.*

The defendants offer five arguments that the jury instructions were erroneous, but their arguments fail.  The defendants' arguments, several of which are raised for the first time on appeal, either misread the jury instruction, misunderstand the requirements to sustain a conviction under the Act, or contradict binding precedent of this Court.

The defendants' challenges of the jury instructions all pertain to the authority granted by the Act to medical practitioners to prescribe controlled substances.  "The overarching aim of the [Controlled Substances Act] is to combat drug abuse and to control the legitimate and illegitimate traffic of controlled substances."  United States v. Tobin, 676 F.3d 1264, 1275 (11th Cir. 2012).  The Act provides that, "[e]xcept as authorized by [the Act], it shall be unlawful for any person knowingly or intentionally . . . to . . . distribute[ ] or dispense . . . a controlled substance."  21 U.S.C. § 841(a)(1).  But one important exception permits registered "practitioner[s]" to dispense Schedule II, Schedule III, and Schedule IV controlled substances with a "prescription."  Id. § 829.

18

Prescriptions are lawful if they are "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a). "The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription." Id. If a prescription is issued without a legitimate medical purpose or outside the usual course of professional practice, "the person knowingly filling such a purported prescription, as well as the person issuing it," is subject to the criminal penalties of section 841. Id. To convict a licensed physician under section 841(a)(1), "it [is] incumbent upon the government to prove that he dispensed controlled substances for other than legitimate medical purposes in the usual course of professional practice, and that he did so knowingly and intentionally." Ignasiak, 667 F.3d at 1228 (quoting United States v. Guerrero, 650 F.2d 728, 730 (5th Cir. 1981)). And to convict a licensed pharmacist under section 841(a)(1), the government must prove that the pharmacist filled a prescription knowing that a physician issued the prescription without a legitimate medical purpose or outside the usual course of professional practice. United States v. Hayes, 595 F.2d 258, 261 (5th Cir. 1979).

19

First, all three defendants argue, for the first time on appeal, that the district court instructed the jury to evaluate their conduct against a national standard of practice, which would run afoul of the decision of the Supreme Court in <u>Gonzales</u>, 546 U.S. 243, 126 S. Ct. 904.  Because the defendants failed to raise this objection before the district court, we review only for plain error.  <u>See</u> <u>Wilbur</u>, 393 F.3d at 1204 n.6.  <u>Gonzales</u> concerned an interpretive rule of the Attorney General of the United States that stated that physician-assisted suicide is not a "legitimate medical purpose," <u>see</u> 21 C.F.R. § 1306.04(a), and that a person violates the Act if he prescribes, dispenses, or administers controlled substances to assist suicide. <u>Gonzales</u>, 546 U.S. at 254, 126 S. Ct. at 913–14.  That interpretive rule conflicted with an Oregon law that permitted doctors to dispense or prescribe a lethal dose of drugs upon the request of a terminally ill patient.  <u>Id.</u> at 249, 126 S. Ct. at 911.  The Supreme Court explained that "there is no question that the Federal Government can set uniform national standards" of medical practice, <u>id.</u> at 271, 126 S. Ct. at 923, but the Court concluded that the Act "manifests no intent to regulate the practice of medicine generally," <u>id.</u> at 270, 126 S. Ct. at 923.  The Court stated that, because "[t]he structure and operation of the [Act] presume and rely upon a functioning medical profession regulated under the States' police powers," the Act does not empower the Attorney General to declare that physician-assisted suicide

20

is not a legitimate medical purpose.  Id.  We have interpreted Gonzales to state that, "[w]hen Congress enacted the [Act], it thus manifested its intent to leave it to the states to define the applicable standards of professional practice."  Tobin, 676 F.3d at 1275.

The district court committed no error when it instructed the jury to consider whether the defendants acted "in accordance with a standard of medical practice generally recognized and accepted in the United States."  This instruction did not suggest that the jury must evaluate the conduct of the defendants against a single national standard of practice.  The instruction instead required the prosecution to prove that the actions of the defendants were inconsistent with any accepted standard of professional practice.

Gonzales does not govern this appeal.  The prosecution never sought to have the district court impose a national standard of professional practice.  In Gonzales, the Supreme Court concluded that the Attorney General could not issue an interpretive rule that defines the contours of legitimate medical practice in a particular state.  But here the question whether the defendants acted in accord with an accepted standard of professional practice was always a question for the jury.  No regulation precluded the jury from finding that the defendants acted in the usual course of professional practice, nor did a federal regulation conflict with a state

21

law. In fact, the defendants do not even argue that there is any difference between the Georgia standard of practice and the supposed national standard that the jury purportedly considered.

The defendants contend that our decision in Tobin supports their argument about this jury instruction, but we disagree. In Tobin, we suggested, in a footnote, as follows that this jury instruction might run afoul of Gonzales if it were to read the Act to impose a national standard of professional practice:

> To the extent that the instruction speaks to "standards of [professional] practice generally recognized and accepted in the United States," and thus suggests that the [Act] imposes national standards of professional practice, it is inconsistent with the Supreme Court's observation that unless Congress specifies otherwise, the [Act] does not establish national standards. Gonzales, 546 U.S. at 269–72, 126 S. Ct. at 922–24. Again, none of the appellants have argued that the District Court should have instructed the jury to assess their behavior in light of the state standards that applied to them.

Tobin, 676 F.3d at 1281 n.8. But that dicta makes clear that none of the parties argued that the jury instruction was inconsistent with Gonzales. Tobin instead speculated sua sponte that the jury instruction would be inconsistent with Gonzales only "[t]o the extent that the instruction . . . suggests that the [Act] imposes national standards of professional practice." As we have explained, this jury instruction does not read the Act to impose a national standard of professional practice.

22

Even if we were to conclude that the district court committed an error, that error was not plain. An error is "plain" if it is "clear" or "obvious." United States v. King, 73 F.3d 1564, 1572 (11th Cir. 1996) (quoting United States v. Olano, 507 U.S. 725, 734, 113 S. Ct. 1770, 1777 (1993)). "It is the law of this circuit that, at least where the explicit language of a statute or rule does not specifically resolve an issue, there can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it." United States v. Lejarde-Rada, 319 F.3d 1288, 1291 (11th Cir. 2003). No Supreme Court or Eleventh Circuit precedent disapproves jury instructions to evaluate the conduct of medical professionals against "a standard of medical practice generally recognized and accepted in the United States." To the contrary, in United States v. Moore, 423 U.S. 122, 96 S. Ct. 335 (1975), the Supreme Court upheld the conviction of a physician who, the record suggested, had "acted as a large scale 'pusher' – not as a physician," id. at 143, 96 S. Ct. at 345, where the jury had been instructed to determine whether the physician had acted "in the usual course of a professional practice and in accordance with a standard of medical practice generally recognized and accepted in the United States," id. at 139, 96 S. Ct. at 343–44. And since the Supreme Court decided Gonzales, our Circuit has rejected objections to a jury instruction that measures the conduct of a physician against a standard of medical practice

23

"generally recognized and accepted in the United States." See United States v. Merrill, 513 F.3d 1293, 1306 (11th Cir. 2008); United States v. Williams, 445 F.3d 1302, 1309–10 (11th Cir. 2006), abrogated on other grounds by United States v. Lewis, 492 F.3d 1219, 1220 (11th Cir. 2007) (en banc).  In the light of these precedents, the district court committed no plain error.

Nor did any alleged error affect the substantial rights of the defendants.  This deferential test of prejudice "almost always requires that the error must have affected the outcome of the district court proceedings."  United States v. Pantle, 637 F.3d 1172, 1177 (11th Cir. 2011) (quoting United States v. Rodriguez, 398 F.3d 1291, 1299 (11th Cir. 2005)).  Even if the district court should have instructed the jury to evaluate the conduct of the defendants against only a Georgia standard of medical practice, the defendants failed to offer any proof that the Georgia standard differs at all from any national standard that the jury purportedly considered.

The defendants argue that the alleged error in this instruction is "jurisdictional" and somehow deprived the district court of the authority to hear this matter, but we disagree.  "A jurisdictional defect is one that strips the court of its power to act and makes its judgment void."  McCoy v. United States, 266 F.3d 1245, 1249 (11th Cir. 2001) (alteration and internal quotation marks omitted).  For

example, an indictment suffers from a jurisdictional defect when it charges no crime at all. See United States v. Peter, 310 F.3d 709, 713 (11th Cir. 2002). The district court had jurisdiction based on a valid indictment that charged the defendants with violations of the Act. The defendants argue that the district court charged the jury about an incorrect standard of practice, but this argument is not about a jurisdictional error. Federal Rule of Criminal Procedure 30 provides that the failure of a party to object to a jury instruction bars appellate review, except for plain error, Fed. R. Crim. P. 30(d), and we have explained that when the Federal Rules provide that a right may be waived, that right "simply does not fit the mold of a jurisdictional defect," McCoy, 266 F.3d at 1249.

Second, Green argues, again for the first time on appeal, that the jury instruction about the good faith defense was misleading because the reference to "a standard of medical practice generally recognized and accepted in the United States" suggested that there was a single standard of professional practice against which the jury had to evaluate his conduct, but we again disagree. Because Green did not raise this objection before the district court, we again review only for plain error. Experts for both the prosecution and the defense testified about the accepted standard of medical practice, and it was for the jury to resolve the conflicting testimony and determine whether Green had acted in accord with the accepted

25

standard of medical practice.  See United States v. Lovern, 590 F.3d 1095, 1100 (10th Cir. 2009).  We have twice held that a district court did not abuse its discretion when it delivered a jury instruction nearly identical to this instruction. See Merrill, 513 F.3d at 1306; Williams, 445 F.3d at 1309–10.

Green argues that the district court should have accepted Green's proposed jury instruction about the good faith defense, but we disagree.  Green proposed that the district court instruct the jury as follows that the defense of good faith turns only on a subjective standard:

> If a doctor dispenses drugs based upon a good faith belief that he is medically treating a patient, then the doctor has dispensed the drug for a legitimate medical purpose in the usual course of medical practice; that is he has dispensed the drug lawfully.  In other words, a doctor should not be held criminally liable if the doctor acted in good faith when treating his patients.

> Good faith in this context means good intentions and the honest exercise of his best professional judgment as to a patient's needs.  It means that the doctor acted in accordance with what he reasonably believed to be proper medical practice.

This proposed instruction provided an incorrect statement of the law.  We have held that whether a defendant acts in the usual course of his professional practice must be evaluated based on an objective standard, not a subjective standard.  See Tobin, 676 F.3d at 1282–83; Merrill, 513 F.3d at 1306; Williams, 445 F.3d at 1309.

26

Third, Joseph argues, for the first time on appeal, that, although the district court included a reference to the "good faith" defense in its charge about the substantive counts, the district court failed to do so in its instruction about the conspiracy counts, but this argument fails. Because Joseph did not raise this objection before the district court, our review again is for plain error, and we "determine[] whether the charges as a whole sufficiently instructed the jury." Tobin, 676 F.3d at 1283 n.11 (quoting United States v. Hooshmand, 931 F.2d 725, 731 (11th Cir. 1991)). The jury instruction about the conspiracy count explained that the object of the conspiracy must be to distribute controlled substances "not for a legitimate medical purpose and outside the usual course of professional practice," and the jury instruction about the substantive counts explained that Joseph could not be found guilty if he acted "in good faith." As we explained in Tobin, the "jury could have easily referred back to the District Court's instruction on the [substantive] count[s] to refresh its understanding of the law that applies to the [conspiracy] count." Id. Joseph also cannot show that any error was "clear" or "obvious." King, 73 F.3d at 1572. The law of this Circuit is not even clear that Joseph was entitled to a "good faith" jury instruction at all. Tobin, 676 F.3d at 1283 n.11 (stating that a defendant "was not entitled to an instruction that even referred to good faith").

27

Fourth, Joseph argues that the jury instructions erroneously conflated the legal distinction between "distributing" and "dispensing" controlled substances. Section 841(a)(1) of the Act states that, "[e]xcept as authorized by [the Act], it shall be unlawful for any person knowingly or intentionally . . . to . . . distribute[ ] or dispense . . . a controlled substance." 21 U.S.C. § 841(a)(1). The Act defines "dispense" as "to deliver a controlled substance to an ultimate user or research subject by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance." Id. § 802(10). The Act defines "distribute" as "to deliver (other than by administering or dispensing) a controlled substance or a listed chemical." Id. § 802(11). Joseph argues that a "distribution" is "by definition not lawful conduct because it is statutorily defined to comprise all transactions other than lawful 'dispensing.'" Joseph contends that, under the Act, "a transaction may be either unlawful distributing or lawful dispensing, but not both." Joseph argues that the district court elided this distinction between the lawful act of dispensing prescriptions and the unlawful act of distributing prescriptions when the district court instructed the jury that "[a] pharmacist who is registered under the Controlled Substances Act is authorized to dispense or distribute controlled substances pursuant to the legitimate prescription of a registered physician." Joseph argues that, because of this error, "[t]here was

28

simply no legal, articulated basis left upon which to distinguish between lawful and unlawful transactions." Because Joseph did not raise this objection before the district court, we review only for plain error.

We reject the argument that, under the Act, all acts to dispense prescriptions are lawful and all acts to distribute prescriptions are unlawful. The Supreme Court, in Moore, 423 U.S. at 124, 96 S. Ct. at 337, explained that persons registered under the Act may be prosecuted for either dispensing or distributing controlled substances. We have rejected the argument that licensed individuals cannot unlawfully "dispense" prescriptions, and we have explained that licensed practitioners may be indicted for either unlawful distribution or unlawful dispensation. United States v. Harrison, 651 F.2d 353, 354 & n.1 (5th Cir. 1981). No error, plain or otherwise, occurred.

Fifth, Green argues that the district court erred when it instructed the jury about the trigger for an elevated prison sentence, 21 U.S.C. § 841(b)(1)(C), but we disagree. Section 841 makes it a crime for a person to unlawfully dispense or distribute a Schedule II controlled substance and provides for a maximum sentence of 20 years of imprisonment, but it also provides a minimum prison sentence of 20 years and a maximum prison sentence of life if "death or serious bodily injury results from the use of such substance." Id. The indictment charged Green with 13

counts of unlawfully dispensing or distributing a Schedule II controlled substance to a patient who suffered death or serious bodily injury as a result, and the jury found Green guilty of one of those 13 counts. Green argues that the district court erred when it instructed the jury that the controlled substance must be an "actual" or "but for" cause of the victim's death or serious bodily injury. But this argument is foreclosed by United States v. Webb, 655 F.3d 1238 (11th Cir. 2011), where we held that section 841(b)(1)(C) "requires only proof that the death resulted from the victim's use of a controlled substance dispensed by the defendant," id. at 1250. Green argues that we should reconsider Webb, but "it is the firmly established rule of this Circuit that each succeeding panel is bound by the holding of the first panel to address an issue of law, unless and until that holding is overruled en banc, or by the Supreme Court." United States v. Hogan, 986 F.2d 1364, 1369 (11th Cir. 1993).

B. *Probable Cause Supported the Warrant to Search Green's Home*.

Green argues that the warrant to search his home was not supported by probable cause. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and it provides that "no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. A search warrant is supported by probable cause if

the supporting affidavit establishes "a connection between the defendant and the location to be searched; . . . a link between the location and criminal activity; and . . . the informant's veracity and basis of knowledge." United States v. Davis, 313 F.3d 1300, 1303 (11th Cir. 2002). The magistrate judge who reviews the application for a warrant must consider the "totality-of-the-circumstances" and "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Gates, 462 U.S. at 238, 103 S. Ct. at 2332. "This circuit has stated that probable cause exists 'if facts within the magistrate's knowledge and of which he had reasonably trustworthy information would warrant a man of reasonable caution in the belief that a crime was committed and that evidence is at the place to be searched.'" United States v. Betancourt, 734 F.2d 750, 754 (11th Cir. 1984) (quoting United States v. Strauss, 678 F.2d 886, 892 (11th Cir. 1982)).

The record supports the finding of probable cause to search Green's home. The warrant to search Green's home was supported by the 39-page affidavit of Sergeant Wayne Franklin, which provided substantial evidence that Green violated the Act and that evidence of Green's crimes would be found at his home. The affidavit stated that, during the course of the investigation of Green's medical

31

clinic, police obtained evidence that Green "issued [to his patients] prescriptions for highly addictive drugs with minimal or no tests to determine the proper medical need for the drugs." The affidavit stated that this information was verified by undercover agents who received prescriptions for addictive substances after Green conducted only cursory medical examinations of them. The affidavit stated that Green issued prescriptions to some patients even after he received complaints that they were addicted to their prescription drugs. The affidavit also provided evidence that some of Green's patients died from drugs he prescribed for them, and the affidavit recounted police interviews of some of Green's patients who stated that Green gave them prescriptions for addictive drugs after performing only a cursory medical examination.

Green acknowledges that the lengthy affidavit sets forth a "litany of facts" that suggest he violated the Act, but he argues that the affidavit was deficient because it was not supported by expert medical testimony that his practices were outside the usual course of professional practice or not for a legitimate medical purpose. He argues that, without expert testimony, the judge who approved the search warrant could not have had probable cause to suspect that Green's medical practices were unlawful. We disagree. Because Green did not raise this specific

objection to the search warrant before the district court, we review only for plain error.

Expert medical testimony is not required to establish probable cause that a defendant violated the Act. Expert medical testimony is not even necessary to sustain a conviction under the Act because a jury may find that a doctor violated the Act "from evidence received from lay witnesses surrounding the facts and circumstances of the prescriptions." United States v. Rogers, 609 F.2d 834, 839 (5th Cir. 1980). The "probable cause" standard requires the government to produce much less evidence than it must present to sustain its burden of proof at trial. United States v. Middleton, 599 F.2d 1349, 1356 (5th Cir. 1979). If expert medical testimony is not required to prove beyond a reasonable doubt that Green violated the Act, expert testimony is not required to establish probable cause that he violated the Act. And we have held that a warrant affidavit establishes probable cause that the defendant violated the Act when the affidavit was not supported by expert testimony that the physician violated accepted medical standards. See Betancourt, 734 F.2d at 754.

Green also argues that the affidavit failed to establish probable cause that evidence of criminal conduct would be found at Green's home, but we disagree. Green raised this objection to the search warrant before the district court.

33

"Probable cause to search a residence requires some nexus between the premises and the alleged crime." United States v. Bradley, 644 F.3d 1213, 1263 (11th Cir. 2011). "Evidence that a defendant has stolen material which one normally would expect him to hide at his residence will support a search of his residence." United States v. Jenkins, 901 F.2d 1075, 1080–81 (11th Cir. 1990) (quoting United States v. Maestas, 546 F.2d 1177, 1180 (5th Cir.1977)). "[A] police officer's expectation, based on prior experience and the specific circumstances of the alleged crime, that evidence is likely to be found in a suspect's residence satisfies probable cause." Bradley, 644 F.3d at 1263–64. Sergeant Franklin stated in his affidavit that, during his career, he had conducted or assisted in over 1,000 investigations for violations of the Georgia Controlled Substances Act, and that he had investigated the unlawful distribution of both prescription drugs and "street drugs" like cocaine and ecstasy. Franklin also stated that, based on his knowledge, training, and experience, dealers often store at their home illicit cash proceeds, receipts, and other evidence of their crimes. This experience, along with the evidence that Green violated the Act, provided probable cause to search Green's home. Green argues that Franklin's affidavit was based only on Franklin's experience with sellers of street drugs, but Franklin's affidavit stated that his experience involved

34

investigating a range of drug crimes, including the unlawful sale of prescription drugs. Franklin's affidavit established probable cause to search Green's home.

C. *The District Court Did Not Abuse Its Discretion When It Admitted Testimony That Green's Patients Included About 300 "Known Drug Offenders."*

Green argues that the district court abused its discretion when it admitted the testimony of an investigator who testified that police learned, during the course of their investigation, that Green's patients included about 300 "known drug offenders," but we disagree. Green argues that the government did not clearly explain the meaning of the term "drug offenders," and that the government did not adequately explain how investigators identified the 300 drug offenders. Sergeant Manny Quinones, a Houston County police officer who participated in the investigation of Green's clinic, testified that police learned that Green's patients included about 300 "known drug offenders." Quinones adequately explained that the 300 individuals had all violated a drug law in the past. The government also laid an adequate foundation for how it identified these 300 drug offenders. Quinones testified that the government identified these individuals based on months of visual surveillance of the clinic, investigation of the license plate numbers of Green's patients, traffic stops of vehicles leaving the clinic, and sixty-four trash pulls conducted at the clinic.

35

Green argues that Quinones's statement about the 300 known drug offenders was "a summary of the work he had done," and that the government "was under an evidentiary obligation to present the information upon which he relied in compiling that summary statistic," but this argument fails too. Federal Rule of Evidence 1006 permits parties to present summaries of evidence and requires only that the proponent of the evidence "make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place." Fed. R. Evid. 1006. Green does not argue that the facts supporting Quinones's statement were not readily available to him.

Green also argues that the testimony should have been excluded as unduly prejudicial, but the district court was entitled to find to the contrary. To be sure, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. But we have explained that "Rule 403 is an extraordinary remedy which should be used only sparingly since it permits the trial court to exclude concededly probative evidence. In criminal trials relevant evidence is inherently prejudicial. [Thus, t]he rule permits exclusion only when unfair prejudice substantially outweighs probative value." Merrill, 513 F.3d at 1301 (quoting Betancourt, 734 F.2d at 757). The evidence that many of Green's patients were either drug abusers or drug sellers

36

was probative of Green's guilt. The testimony was relevant to prove that many of Green's patients either abused their drugs or sold their drugs and that Green either knew or should have known about his patients' misuse of their prescription drugs. The district court did not abuse its discretion when it admitted the testimony.

D. *Sufficient Evidence Supports the Defendants' Convictions.*

Green and Mack raise two objections to the sufficiency of the evidence to support their convictions. First, Green and Mack argue that the prosecution presented insufficient evidence to convict them as to counts 52 through 83, for unlawfully dispensing or distributing controlled substances by pre-signing prescriptions during the week of September 23, 2002. Second, Green argues that the prosecution presented insufficient evidence about the standard of medical practice against which the jury had to evaluate their conduct. We discuss each argument in turn.

1. Sufficient Evidence Supports the Convictions of Green and Mack For Delivering Pre-Signed Prescriptions.

Green and Mack argue that there was insufficient evidence to convict them of counts 52 through 83, for unlawfully dispensing or distributing controlled substances by pre-signing prescriptions during the week of September 23, 2002, but we disagree. Counts 52 through 83 charged Green and Mack with knowingly

37

dispensing or distributing a Schedule II controlled substance without a legitimate medical purpose and outside the usual course of professional practice. The indictment charged that Green signed the prescriptions before September 23, 2002, and that Mack delivered the prescriptions to 32 patients during the week of September 23, 2002. To convict Green of violating section 841(a)(1), the prosecution must "prove that he dispensed controlled substances for other than legitimate medical purposes in the usual course of professional practice, and that he did so knowingly and intentionally." Ignasiak, 667 F.3d at 1228 (quoting Guerrero, 650 F.2d at 730). The mens rea required for a conviction under section 841(a)(1) is knowledge, not willfulness. Tobin, 676 F.3d at 1279–80. "Because the [Act] prohibits the distribution of prescription drugs that is not authorized, a distribution is unlawful if 1) the prescription was not for a 'legitimate medical purpose' or 2) the prescription was not made in the 'usual course of professional practice.'" Id. at 1282 (citation omitted). Mack was charged and convicted as both a principal, 21 U.S.C. § 841(a)(1), and an aider and abettor, 18 U.S.C. § 2. "To sustain a conviction under an aiding and abetting theory, the prosecution must show that 'the defendant associated [her]self with a criminal venture, participated in it as something [s]he wished to bring about, and sought by [her] actions to make

38

it succeed.'" United States v. Pantoja–Soto, 739 F.2d 1520, 1525 (11th Cir. 1984) (quoting United States v. Bryant, 671 F.2d 450, 454 (11th Cir. 1982)).

The government presented sufficient evidence to sustain the convictions of Green and Mack as to counts 52 through 83. Green and Mack both testified that they violated a federal regulation that provides that "[a]ll prescriptions for controlled substances shall be dated as of, and signed on, the day when issued." 21 C.F.R. § 1306.05. Mack also conceded that she lacked the authority to write prescriptions for Schedule II substances, that she knew she lacked the authority to do so, and that she nevertheless delivered the prescriptions for Schedule II substances to her patients. Dr. Straus, the expert witness of the government, testified that it is a violation of both federal and state regulations to issue pre-signed and pre-dated prescriptions. Dr. Straus testified that a reasonable doctor and physician's assistant would know that it is unlawful to distribute pre-signed prescriptions. Dr. Straus testified that the prohibition against pre-signed prescriptions is designed to ensure that all patients receive a medical examination by a licensed physician before the physician prescribes the patient a drug and to ensure that physicians do not act as drug pushers by writing prescriptions for patients with no medical need for those prescriptions.

39

Although we agree with Green and Mack that a violation of section 1306.05 does not constitute a per se violation of section 841, the jury was entitled to infer, based on Green's pre-signing and pre-dating of the prescriptions and Mack's delivery of those prescriptions to Green's patients, that they violated the Act. The record establishes that Green and Mack delivered Schedule II prescriptions to patients who were never examined by a physician. Mack met with those patients, but even she performed no physical examinations or only cursory physical examinations. Mack delivered the prescriptions based on her judgment that the patients had a legitimate medical need for the Schedule II substances, but she lacked authority to make that medical conclusion. And a physician's delivery of a prescription without conducting any physical examination of the patient provides strong evidence to support a conviction under the Act. See United States v. Rosen, 582 F.2d 1032, 1036 (5th Cir. 1978) (stating that conduct creating an inference that the defendants violated section 841(a)(1) includes instances where "[n]o physical examination was given"); see also United States v. McIver, 470 F.3d 550, 564 (4th Cir. 2006).

Green and Mack both testified at trial, and their testimony provided "substantive evidence of [their] guilt." United States v. Brown, 53 F.3d 312, 314 (11th Cir. 1995). We have explained that "a defendant's decision to take the stand

and testify to his own state of mind provides the rare opportunity for direct evidence to be presented to the jury." Tobin, 676 F.3d at 1287. "[A] defendant's decision to offer testimony on the issue of mens rea can also be fatal to his attempt to exculpate himself," because his testimony may be used as substantive evidence of guilt. Id. "In fact, where there is 'some corroborative evidence' of guilt, a defendant's testimony 'may establish, by itself, [the] elements of the offense.'" Id. (quoting Brown, 53 F.3d at 314–15). Mack testified that she did not know that she was not permitted to distribute the pre-signed prescriptions, and she testified that she thoroughly examined all 32 patients and determined that they had a legitimate medical need for the prescriptions. Green testified that the Drug Enforcement Agency permitted him to pre-sign the prescriptions. The jury was entitled to evaluate the credibility of Green and Mack, discredit their testimony, and infer that their testimony instead provided substantive evidence of their guilt.

A reasonable jury could have found that both Green and Mack violated the Act, and that Mack aided and abetted Green's violations of the Act. "Based upon this evidence, in combination with the experts' testimony, we cannot say the 'jury could not have found the defendant guilty under any reasonable construction of the evidence.'" Ignasiak, 667 F.3d at 1229 (quoting Merrill, 513 F.3d at 1299). Sufficient evidence supports the convictions of Green and Mack.

41

### 2. Sufficient Evidence Supports the Finding that Green Violated the Applicable Standard of Practice.

Green argues that the prosecution presented insufficient evidence to convict him of any count because the prosecution failed to prove the standard of medical practice against which the jury was required to measure his conduct, but we disagree. Before the district court, Green filed a motion for a judgment of acquittal, Fed. R. Crim. P. 29(c), in which he argued that the prosecution presented insufficient evidence to sustain his conviction, but Green failed to make the argument he raises here. Although we customarily review <u>de novo</u> the sufficiency of evidence supporting a conviction, <u>Baker</u>, 432 F.3d at 1231, because Green "did not clearly object to the trial court on this insufficient-evidence basis, the district court can be reversed only upon our finding of plain error." <u>Dunlap</u>, 279 F.3d at 966–67.

Green argues that the prosecution failed to present sufficient expert testimony about the applicable standard of practice, but "the Government does not have to present proof through the use of expert testimony." <u>Rogers</u>, 609 F.2d at 839. "The ultimate issue was not whether [Green's] activities comported with accepted standards of medical practice but whether he knowingly prescribed controlled substances for no legitimate medical purpose outside the course of his

professional practice." Noell v. Bensinger, 586 F.2d 554, 557 (5th Cir. 1978). Although expert testimony is often helpful to the jury, "a jury can find that a doctor prescribed controlled substances not in the usual course of his medical practice and was acting other than for a legitimate medical purpose from evidence received from lay witnesses surrounding the facts and circumstances of the prescriptions." Rogers, 609 F.2d at 839.

The record contains substantial evidence from which a reasonable jury could have found that Green acted without a legitimate medical purpose and outside the usual course of professional practice. Conduct that suggests that a defendant distributed a prescription without a legitimate medical purpose and outside the usual course of professional practice includes conduct where "[a]n inordinately large quantity of controlled substances was prescribed[,] . . . [l]arge numbers of prescriptions were issued[,] . . . [n]o physical examination was given[,] . . . [t]he physician issued prescriptions to a patient known to be delivering the drugs to others[,] . . . [and] [t]here was no logical relationship between the drugs prescribed and treatment of the condition allegedly existing." Rosen, 582 F.2d at 1036. The record establishes that Green prescribed an inordinate amount of certain controlled substances, that he did so after conducting no physical examinations or only a cursory physical examination, that Green knew or should have known that his

43

patients were misusing their prescriptions, and that many of the combinations of prescription drugs were not medically necessary.

Both the prosecution and the defense also presented the jury with substantial expert testimony about the applicable standard of professional conduct. Dr. Straus testified at length about the applicable standard. Dr. Straus testified that there are medical standards in the practice of pain management, and he explained how doctors must treat their patients to comport with those standards. Dr. Straus testified that doctors must first conduct a comprehensive physical exam, conduct any appropriate laboratory testing, and inquire into a patient's medical history before diagnosing the patient's illness. Dr. Straus testified that a pain management doctor must consider whether there are any red flags that indicate the patient is abusing his prescription drugs. Dr. Straus testified that doctors should consider ways to treat pain other than through narcotics treatment, that it is customarily inappropriate for a physician to treat a patient by immediately prescribing him a controlled substance, and that if the doctor decides to prescribe a controlled substance, he should move "up the ladder" and begin his treatment by distributing less powerful and less addictive drugs. Dr. Straus testified that, after prescribing a drug, accepted medical standards require a doctor to follow up with the patient and ensure that the patient still needs that prescription. Dr. Straus also testified that the

44

medical standards require doctors to document their treatment of patients and record the prescriptions they issue to their patients. Dr. Straus then testified that, based on his review of the medical records maintained by Green and Mack, their medical treatment was "below minimum standards on recordkeeping, on treatment, on diagnosis." Dr. Straus testified that there was no legitimate medical reason to prescribe many of the combinations of drugs that Green prescribed for his patients. And Dr. Straus concluded that, after reviewing the medical records, "trying to find legitimate medical reasons that isn't, sort of, you're really bending over backwards and just making stuff up to justify [the medical practices of Green and Mack]." Dr. Adams also described the applicable standard of medical practice. Dr. Adams testified about the range of medically acceptable ways to treat patients with physical pain, and he testified that doctors must tailor which drugs they prescribe based on the needs of each individual patient. Dr. Adams also testified that doctors must maintain comprehensive medical records, and that he had difficulty understanding Green's byzantine medical records.

## E. *Green's Sentence Is Reasonable*.

Green argues that the district court abused its discretion when it sentenced Green to 30 years of imprisonment. Because the jury found Green guilty of one count of unlawfully dispensing or distributing a controlled substance that caused

45

death or serious bodily injury, a mandatory minimum sentence of 20 years of imprisonment, and a statutory maximum sentence of life in prison, applied to Green. See 21 U.S.C. § 841(b)(1)(C). Green's presentence investigation report calculated Green's offense level as 42, his criminal history category as I, and his guideline range as 30 years of imprisonment to life imprisonment. The district court adopted the guideline range of the presentence investigation report, and Green does not contend that the district court incorrectly calculated his guideline range. Green instead argues that the district court abused its discretion when it imposed a sentence of 30 years of imprisonment and refused to adopt a downward variance from his guideline range. Green argues that the purposes of sentencing may be achieved with the mandatory minimum sentence of 20 years of imprisonment, not a sentence of 30 years, which effectively amounts to a life sentence.

Section 3553(a) requires the district court to impose a sentence "sufficient, but not greater than necessary," to comply with the purposes of sentencing. 18 U.SC. § 3553(a). The purposes of sentencing include the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; "to afford adequate deterrence to criminal conduct"; "to protect the public from further crimes of the defendant"; and "to

46

provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." Id. § 3553(a)(2). The district court must also consider "the nature and circumstances of the offense and the history and characteristics of the defendant," "the kinds of sentences available," the Guidelines range, any pertinent policy statements of the Sentencing Commission, "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," and "the need to provide restitution to any victims of the offense." Id. § 3553(a)(1), (3)–(7). "We will defer to the district court's judgment regarding the weight given to the § 3553(a) factors unless the district court has made a clear error of judgment and has imposed a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." Gonzalez, 550 F.3d at 1324 (internal quotation marks omitted).

The sentence imposed by the district court is reasonable. This sentence was at the nadir of Green's guideline range of 30 years of imprisonment to life imprisonment. Although we have not adopted a presumption that a sentence within the guideline range is reasonable, we have stated that "ordinarily we would expect a sentence within the Guidelines range to be reasonable." United States v. Chavez, 584 F.3d 1354, 1365 (11th Cir. 2009) (quoting United States v. Talley,

431 F.3d 784, 788 (11th Cir. 2005)).  The jury convicted Green of 46 counts of violating or conspiring to violate the Controlled Substances Act, including one count of unlawfully dispensing or distributing controlled substances and causing death or serious bodily injury.  Both the statutory penalty and the guideline range permitted the district court to impose a much more severe sentence of imprisonment.  The district court did not abuse its discretion when it sentenced Green to 30 years of imprisonment.

## IV.  CONCLUSION

We **AFFIRM** the convictions of Green, Mack, and Joseph, and the prison sentence of Green.

FRIEDMAN, District Judge, concurring:

I concur in the decision to affirm the convictions of all three appellants in this case and join fully in the analysis contained in Judge Pryor's persuasive opinion for the court.

I add these few additional comments with respect to the sufficiency of the evidence challenge raised by appellant Dorothy Mack. Her counsel argues, among other things, that there was insufficient evidence regarding her mens rea. I agree with my colleagues that there was sufficient evidence to convict Mack based on her admitted violations of 21 C.F.R. § 1306.05 – which is relevant evidence, though not sufficient in itself – her admissions on the witness stand, and the jury's assessment of her credibility, as well as additional circumstantial evidence of her guilt. I am concerned, however, that the jury was never instructed that Mack could be convicted as an aider and abettor only if she held the same mens rea as her principal, Dr. Green.

Ms. Mack was charged in the Indictment as both a principal and an aider and abettor. Throughout the trial, however, the government's theory was exclusively one of aiding and abetting, and the district judge clearly perceived it as such. As the court's opinion points out, to prove aiding and abetting, the government must show that "the defendant associated [her]self with a criminal venture, participated

49

in it as something [s]he wished to bring about, and sought by [her] actions to make it succeed." Opinion at 38–39 (quoting United States v. Pantoja-Soto, 739 F.2d 1520, 1525 (11th Cir. 1984)). It is equally clear, however, that under such a theory the government also had to show that Mack had the same mens rea Dr. Green had, see United States v. Leonard, 138 F.3d 906, 909 (11th Cir. 1998), something the jury was never told. In my view, this means that the government would have had to prove either that Mack knew there was no "legitimate medical purpose" for the prescriptions written by Dr. Green, *or* knew that Dr. Green, by failing to properly examine patients and directing Mack to give pre-signed prescriptions to these patients on his behalf, was not acting in the "usual course of professional practice."[1]

The prosecutor argued to the jury that Mack had the same obligation as Dr. Green "to make sure that the medical care is legitimate," and the trial judge, in denying a post-trial Rule 29 motion, stated that the jury could reasonably have found that Mack was aware that the prescriptions "were not for a legitimate medical purpose." Yet the jury instructions given with respect to Mack failed to

---

[1] Even as a principal, Mack would have had to have been aware that there was no legitimate medical purpose for the prescriptions issued by Dr. Green in order to be convicted. United States v. Lovern, 590 F.3d 1095, 1196 (10th Cir. 2009).

50

explain any of this, despite numerous requests from her lawyer. During the charge conferences, counsel for Mack specifically requested an instruction on "not for legitimate medical purpose" and "outside the usual course of professional practice." He argued that the government had to prove "this additional feature of the case; in fact, it's an essential one to make this case work, the legitimacy and usualness of it." He also requested a "good faith" defense charge.

When it came time for jury instructions, however, the district judge instructed the jury about these safe havens with respect to Dr. Green and Mr. Joseph, the pharmacist, but not Ms. Mack. The court instructed the jury that Dr. Green could lawfully dispense and distribute controlled substances by prescriptions "for legitimate medical purposes and in the usual course of professional practice," and gave a similar instruction regarding Mr. Joseph. The district court also explained to the jury that a *doctor* is acting in the course of his professional practice if he prescribes a substance "in good faith as part of his medical treatment," and that a *pharmacist* who dispenses a controlled substance "in good faith" pursuant to a prescription does not violate the Controlled Substances Act. Conspicuously absent was any instruction that, as an aider and abettor, Ms. Mack, a physician's assistant, had to know that the prescriptions Dr. Green issued were not for a legitimate medical purpose or issued in the usual course of professional

51

practice or that Mack's good faith reliance on Dr. Green was a relevant factor for the jury's consideration.[2]

The arguments Mack makes in this court are based exclusively on the asserted insufficiency of the evidence and not on these inadequacies in the district court's instructions to the jury. Indeed, in response to questions at oral argument, counsel specifically stated that he was not making an argument based on any failings in the jury instructions. Because the issues that concern me relating to the jury instructions have not been raised on appeal, and because, drawing all reasonable inferences in the light most favorable to the government, I agree there was sufficient evidence for a reasonable jury to find Mack guilty beyond a reasonable doubt, United States v. Hernandez, 433 F.3d 1328, 1333-34 (11th Cir. 2005), I join the court's opinion in all respects.

---

[2] It is not clear from the record whether Mack's counsel adequately objected to these deficiencies in the instructions pursuant to Rule 30(c) of the Federal Rules of Criminal Procedure. After the jury was charged, he said: "I would just like to preserve the objections [to the instructions] I previously made, Your Honor. No new ones."